IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CODY BOOTES and ALEXIS BOOTES )
f/k/a ALEXIS PIETRAS,                          )     C.A. No. 22-154 Erie
           Plaintiffs,             )
                                      )
              v.                    )     District Judge Susan Paradise Baxter
                                      )
PPP FUTURE DEVELOPMENT, INC.,     )
           Defendant.            )

**MEMORANDUM OPINION**

## I.     INTRODUCTION

### A.    Relevant Procedural History

On May 17, 2022, Plaintiffs Cody Bootes and Alexis Bootes f/k/a Alexis Pietras, adult residents of Erie County, Pennsylvania, initiated this action by filing a complaint [ECF No. 1] against Defendant PPP Future Development, Inc., a New York corporation having a principal place of business in Genesee County, New York, asserting multiple claims arising from Defendant's alleged breach of its obligations under an oil and gas lease. Plaintiff subsequently filed an amended complaint on July 22, 2022 [ECF No. 8], which is the operative pleading in this case. The amended complaint asserts seven counts entitled as follows: Count I - Declaratory Judgment; Count II - Breach of Contract (Specific Performance); Count III – Breach of Contract (Damages); Count IV – Trespass; Count V – Public Nuisance; Count VI – Private Nuisance; and Count VII – Negligence Per Se.

On August 5, 2022, Defendant filed a motion to dismiss Plaintiff's amended complaint for failure to state a claim upon which relief may be granted [ECF No. 9]. Plaintiff has filed a

brief in opposition to Defendant's motion [ECF No. 11], and Defendant has filed a reply brief [ECF No. 12]. This matter is now ripe for consideration.

**B.**   **Relevant Factual Allegations**[1]

Plaintiffs reside at 9420 Donlin Road in Greenfield Township, Erie County, Pennsylvania ("Subject Property"). On January 25, 1979, the former owners of the Subject Property, Thomas and Anastasia Graczyk ("the Graczyks"), entered into a lease agreement with Envirogas, Inc. ("Envirogas"), pursuant to which the Graczyks leased their rights to the oil and gas beneath the Subject Property to Envirogas ("Lease"). (ECF No. 8, at ¶ 6). Plaintiffs subsequently purchased the Subject Property from the Graczyks on May 19, 2020, at which time Plaintiffs became successors in interest to the Graczyks as Lessors under the Lease. (Id. at ¶ 7). Defendant is the successor in interest to Envirogas as Lessee under the Lease. (Id. at ¶ 8).

Pursuant to the Lease, Defendant, as Lessee, is granted the "exclusive right to explore and operate for and produce oil and gas, lay and maintain pipelines, build tanks and roads, store gas, store oil, and build other structures thereon necessary to produce, save and sell all such substances." (Id. at ¶ 9). In accordance with the Lease, the Lessee installed certain equipment and structures on the Subject Property to use in the search for and production of oil and gas, including pipelines and two (2) wells. (Id. at ¶ 10). Under the Lease, Defendant, as Lessee, agreed to, *inter alia*: (i) pay royalties to Plaintiffs for all gas produced, and not stored, from the wells; (ii) provide to Plaintiffs two hundred thousand (200,000) cubic feet of gas per year from one of the two wells on the Subject Property "free of cost for [their] own domestic use;" (iii) provide Plaintiffs with the "cash equivalent of two hundred thousand (200,000) cubic feet of gas

---

1

For purposes of deciding Defendant's motion, the Court must accept as true all of Plaintiffs' factual allegations and view them in the light most favorable to Plaintiffs. Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011).

per year due to the existence of the second well on the Subject Property ("Cash Equivalent Payment"); (iv) conduct its operations under the Lease "with reasonable diligence, continuously, in good faith, with first class equipment and appliances, and in accordance with the best customary practices in the field;" (v) "comply with all governmental laws, orders, rules and regulations applicable to Lessee's operations;" and (vi) "bury all pipelines below plow depth." (Id. at ¶¶ 11-13; 16-17; 20-21).

Since the inception of the Lease, the Lessors have used the gas supplied by the Lessee under the Lease as the sole source of gas to the house on the Subject Property, which has no other source of gas available. (Id. at ¶¶ 14-15). The original term of the Lease was one year and was to continue thereafter as long as the Subject Property was operated by the Lessee in the search for or production of oil or gas. (Id. at ¶ 22). Under the terms of the Lease, when Defendant, as Lessee, determines that its operation of the wells on the Subject Property are "no longer commercially feasible, Lessor shall have the option of purchasing the well and pipeline for the sum of One ($1.00) Dollar," or having the wells plugged. (Id. at ¶ 23).

Plaintiffs allege that Defendant has not paid any royalties to them as required by the Lease, nor has Defendant provided Plaintiffs with any monthly written statements of gas production for the Subject Property as required by the Lease. (Id. at ¶¶ 26-27). Defendant has also not provided Plaintiffs with a supply of two hundred thousand (200,000) cubic feet of gas per year from one or the two wells on the Subject Property, and has interrupted the supply of gas "for months at a time." (Id. at ¶¶ 30-31). In particular, Defendant disassembled one of the wells and shut down the supply of gas to Plaintiffs' house, leaving them without gas during the winter of 2020-2021. (Id. at ¶ 36). Defendant also failed to maintain its equipment, which deteriorated

and began to leak substances believed to be "wastewater and/or byproducts of production" onto the Subject Property." (Id. at ¶¶ 33-35).

In September 2020, the Pennsylvania Department of Environmental Protection ("DEP") inspected Defendant's oil and gas operations on the Subject Property and discovered four violations of the Pennsylvania Oil and Gas Act with regard to the well identified as "Well #1." (Id. at ¶¶ 50-51). In addition, the DEP noted that Well #1 did not appear to have produced in several years and was considered to be abandoned. (Id. at ¶ 52). The DEP also cited several statutory violations with regard to the second well on the Subject Property, identified as "Well #2." (Id. at ¶ 53).

The DEP returned for a follow-up inspection on April 30, 2021, at which time it noted that two of the four violations regarding Well #1 had been corrected; however, Defendant was cited for failure to plug the well upon abandonment and for failure to maintain the well and equipment. (Id. at ¶¶ 54-55). The DEP also observed and photographed the discharge of "[s]oapy protection fluid" from well #2, for which Defendant was cited with violations of DEP regulations and the Pennsylvania Storm Water Management Act. (Id. at ¶¶ 56-57).

On June 30, 2021, Plaintiffs' legal counsel sent Defendant a written notice that Plaintiffs were terminating the Lease due to Defendant's material breaches of the Lease, including Defendant's failure to: (i) operate the wells in compliance with Pennsylvania law; (ii) provide monthly statements of production and royalties; (iii) provide Plaintiffs with up to 200,000 cubic feet of gas from one well to supply their house with gas; and (iv) provide the Cash Equivalent Payment for the second well. (Id. at ¶¶ 59-60). In conjunction with their termination of the Lease, Plaintiffs demanded that Defendant fulfill its outstanding obligations under the Lease. (Id. at ¶ 62).

On July 6, 2021, Defendant's legal counsel rejected Plaintiffs' termination of the Lease, and Defendant ultimately restored a supply of gas to Plaintiffs' home from one of the wells as required by the Lease. (Id. at ¶¶63-64).

## II.    DISCUSSION

### A.    Count I – Declaratory Judgment

Plaintiffs allege that "[a]n actual and real controversy exists between the parties as to their respective rights and obligations under the Lease because [Plaintiffs] terminated the Lease, and [Defendant] refuses to recognize the termination." ((ECF No. 8, at ¶ 68). As a result, Plaintiffs request that this Court declare that: (1) Defendant has abandoned its search for and production of gas under the Lease; (2) the Lease is terminated; (3) Defendant has no further right to access, enter upon, or traverse the Subject Property; and (4) all equipment on and beneath the Subject Property is the property of Plaintiffs. (Id. at ¶ 78).

Defendant argues that Plaintiff's declaratory judgment claim should be dismissed because there is no actual controversy at issue and the requested declarations would serve no purpose. In particular, Defendant asserts that Plaintiffs have manufactured a controversy that does not otherwise exist by improperly terminating the Lease in contravention of paragraph 13 of the Lease, which provides as follows:

> When Envirogas, Inc. [now, Defendant], in its sole discretion, determines that the well is no longer commercially feasible, Lessor [Plaintiffs] shall have the option of purchasing the well and pipeline for the sum of One ($1.00) Dollar, or having [Defendant] plug the well.

(ECF No. 8-1, ¶ 13).

Based solely on the foregoing provision, Defendant contends that "there is no ability for [Plaintiffs] to terminate the Lease until [Defendant] determines that the wells are no longer commercially feasible in its sole discretion" and, thus, "[Plaintiffs] cannot unilaterally terminate

the Lease and manufacture a case or controversy necessitating a declaratory judgment…." (ECF No. 10, at p. 6). The Court disagrees.

The above provision merely gives Plaintiffs the option to purchase the wells and to connect pipelines in the event Defendant determines the wells are no longer commercially feasible. It is does not, in any way, make termination of the Lease solely contingent upon Defendant's discretionary determination that the wells are no longer feasible, nor does it foreclose Plaintiffs' right to terminate the Lease based upon Defendant's material breach of other provisions of the Lease. The Court acknowledges, however, that such right of termination is not expressly stated in the Lease.[2] Moreover, the Lease does not clearly set forth the parties' rights and obligations in the event of termination. Thus, Plaintiff's request for declaratory relief is entirely appropriate to determine the parties' rights and obligations under the Lease, and Defendant's motion to dismiss Plaintiff's declaratory judgment claim will be denied.

**B.**  **Counts II and III – Breach of Contract**

The amended complaint contains two claims of breach of contract – one for specific performance (Count II) and one for damages (Count III). Defendant has moved to dismiss both counts, arguing that "Plaintiffs breached the Lease as an anticipatory repudiation" and, as a result, Defendant "cannot be in breach of a lease that was terminated by the party now trying to enforce it," and "is excused from performing any obligations under the Lease" (ECF No. 10, at p.

---

[2] In fact, the only event expressly leading to termination of the Lease is the Lessee's failure to drill a well within one year of the date of the Lease Agreement. (ECF No. 1-2, at ¶ 22). This obviously did not occur here. However, there are other provisions of the Lease in which the right of termination is implied. For instance, paragraph 21 of the Lease states that the Lease "shall not be terminated, in whole or in part, nor shall Lessee be held liable for damages for failure to comply with the express or implied covenants [of the Lease], if compliance therewith is prevented by, or if such failure is the result of interference by … factors beyond Lessee's control." (Id. at ¶ 21). The clear implication of this provision is that the Lease may be terminated and Defendant may be held liable for noncompliance with the terms of the Lease, if such noncompliance is not caused by circumstances beyond Defendant's control.

6

7). However, this argument is based upon the mistaken impression that Plaintiffs anticipatorily repudiated the Lease.

According to the authority cited in Defendant's own brief, an anticipatory repudiation occurs only if a party repudiates a contract "before the time for that party's performance and before a default justifying the repudiation has occurred." 13 <u>Williston on Contracts</u> § 39:37 (4th ed.). Here, Plaintiffs' allegations make clear that their termination of the Lease occurred only after Defendant allegedly defaulted on its obligations under the Lease, as specifically stated in Plaintiffs' termination letter - "Due to PPP's substantial defaults under the Lease, Mr. Bootes is hereby terminating the Lease." (ECF No. 8-3, p. 5). Moreover, there was no performance required of Plaintiffs under the Lease at the time they chose to terminate the Lease. So, the elements of an anticipatory repudiation are not evident here. Accordingly, Defendant's assertion that it is excused from performing its obligations under the Lease is without merit.

Since Defendant has raised no other grounds for the dismissal of Plaintiffs' breach of contract claims, its motion to dismiss these claims will be denied.

### C.   Count IV – Trespass

Plaintiffs claim that, since they terminated the Lease, Defendant's continued entry on the Subject Property to transport gas under, through, over and across the property constitutes a trespass. Defendant argues that this claim should be dismissed because Plaintiff has failed to allege any facts to support their claim that it is transporting gas under, through, over, and across the Subject Property. (ECF No. 10, at p. 8). However, this argument overlooks Plaintiffs' allegations that Defendant "currently owns, possesses, or utilizes various pipelines that traverse [Plaintiffs'] Property without an easement or right of way," and that "[o]utside of the Lease,

[Defendant] does not have a right to access, enter upon, operate the wells, or transport gas under, through, over, and/or across the Property." (ECF No. 8, at ¶¶ 66, 98).

In the event Plaintiffs are able to establish that they properly terminated the Lease, they have set forth sufficient allegations to state a claim of trespass upon which relief may be granted as to any active presence of Defendant on the Subject Property after the Lease was terminated.

### D.    Count V – Public Nuisance

Defendant has moved to dismiss Plaintiffs' claim of public nuisance, arguing that the allegations of the amended complaint fail to satisfy the criteria for a public nuisance claim under Restatement Second, Torts § 821B(2);[3] however, this argument essentially disregards Plaintiff's allegations that Defendant was cited by the Pennsylvania Department of Environmental Protection for various violations of both the Oil and Gas Act, 58 Pa. C.S. §§ 3201-3274, and the Solid Waste Management Act, Pa. C.S. §§ 6018.101-6018.1003, each of which specifically state that violations thereof "constitute a public nuisance" (ECF No. 8, at ¶¶ 102-110). Plaintiffs have sufficiently alleged that Defendant's actions resulted in statutory violations that are deemed public nuisances as a matter of law. Thus, Defendant's motion to dismiss this claim is unfounded.

---

[3] Restatement Second, Torts § 821B(2) provides as follows:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

### E.    Count VI – Private Nuisance

Defendant has moved to dismiss Plaintiffs' private nuisance claim, arguing that "the harm alleged by [Plaintiffs] is inconvenience or annoyance" without any "real significant sustained invasion. (ECF No. 10, at p. 11). This argument is also without merit at the pleading stage.

"A private nuisance exists when a person's conduct invades 'another's interest in the private use and enjoyment of land,' and that invasion is either intentional and unreasonable or unintentional and negligent." Baptiste v. Bethlehem Landfill Co., 965 F.3d 214, 222-23 (3d Cir. 2020), quoting Phila. Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315 (3d Cir. 1985). Here, Plaintiffs have alleged that Defendant failed to maintain its equipment, thus causing wastewater to leak onto and contaminate the Subject Property and interfering with Plaintiffs' use and enjoyment of their Property. This is sufficient to state a claim of private nuisance upon which relief may be granted, and Defendant's motion to dismiss such claim will be denied.

### F.    Count VII – Negligence *Per Se*

Pennsylvania recognizes that a violation of a statute or ordinance may serve as the basis for negligence *per se*. Ramalingam v. Keller Williams Realty Group, Inc., 121 A.3d 1034, 1042 (Pa. Super. 2015). However, a court will not use a statute or regulation as the basis of negligence *per se* where the purpose of the statute is to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public. Centolanza v. Lehigh Valley Dairies, 635 A.2d 143, 150 (1993), aff'd 540 Pa. 398, 658 A.2d 336 (1995). In order to state negligence *per se* in Pennsylvania, a plaintiff must allege: "(1) the purpose of the statute [is], at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) the statute or regulation must clearly apply to the conduct of the defendant;

(3) the defendant must violate the statute or regulation; and (4) the violation of the statute must be the proximate cause of the plaintiff's injuries." <u>Ramalingam</u>, at 1042-43, <u>citing</u> <u>Schemberg v. Smicherko</u>, 85 A.3d 1071, 1073-74 (Pa. Super. 2014) (citation omitted).

Here, Plaintiffs' negligence *per se* claim is based upon Defendant's various violations of the Oil and Gas Act and the Solid Waste Management Act ("SWMA"), which caused them to suffer injury in the form of contamination of the Subject Property. Defendant has moved to dismiss this claim, asserting that Plaintiffs fail to allege how the Acts at issue are intended to protect their interests individually, as opposed to the public in general. (ECF No. 10, at p. 11). Defendant's point is well taken to the extent Plaintiffs attempt to state a negligence *per se* claim based upon Defendant's violations of the SWMA.

In our Circuit, "it is firmly established that violations of the SWMA do not provide a basis for a negligence action because the statute is intended to benefit the public generally, not a particular group, as required by the negligence *per se* standard. <u>Russell v. Chesapeake Appalachia, LLC</u>, 2014 WL 6634892, at *3 (M.D. Pa. Nov. 21, 2014), <u>citing</u> <u>Hartle v. FirstEnergy Generation Corp.</u>, 2014 WL 1117930, at *5 (W.D. Pa. Mar. 20, 2014) (dismissing negligence *per se* claim based on violation of the SWMA, concluding that the SWMA "is intended to benefit the public generally, not to protect the interest of a particular group"); <u>Tri– County Bus. Campus Joint Venture v. Clow Corp.</u>, 792 F.Supp. 984, 995 (E.D.Pa.1992) ("[Defendant] correctly notes ... that a plaintiff cannot ... [initiate] a cause of action for negligence *per se* based on SWMA violations."); <u>Pottstown Indus. Complex v. P.T.I. Servs., Inc.</u>, 1992 WL 50084, at *14 (E.D. Pa. Mar. 10, 1992) (same); <u>Fallowfield Dev. Corp. v. Strunk,</u> 1991 WL 17793, at *10 (E.D. Pa. Feb.11, 1991) (disallowing negligence *per se* claim based on SWMA, finding that "[t]he statue is intended to protect the health, safety and welfare of

the community and not individuals seeking to recover pecuniary losses"). Accordingly, Plaintiffs' negligence *per se* claim based on Defendant's violations of the SWMA will be dismissed.[4]

However, the same cannot be said of Plaintiffs' negligence *per se* claim based upon Defendant's violations of the Oil and Gas Act. In this regard, the Roth case cited by Plaintiffs is instructive. In Roth, the court noted that one of the express intents behind the Oil and Gas Act is to "'[p]rotect the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs.'" Roth, 919 F.Supp.2d at 489, quoting 58 Pa. C.S. § 3202(3). In light of this, the Roth court found that the plaintiffs, who resided less than 1,000 feet from gas wells, fell "directly within the particular group of individuals that the Act is intended to protect." Id. The same holds true here, as the gas wells at issue in this case are similarly located in close proximity to Plaintiffs' residence. Since Plaintiffs are within the particular group of individuals the Oil and Gas Act was designed to protect, their negligence *per se* claim based upon Defendant's violations of the Oil and Gas Act will be allowed to survive Defendant's motion to dismiss.

An appropriate Order follows.

---

[4] Plaintiff's reliance upon the case of Roth v. Cabot Oil & Gas Corp., 919 F.Supp.2d 476, 488-89 (M.D. Pa. 2013) is misplaced. Although the Roth court allowed a negligence *per se* claim based upon violations of both the Solid Waste Management Act and the Oil and Gas Act to survive a motion to dismiss, the court's decision was based upon a similar holding by the Eastern District Court in Fallowfield Dev. Corp. v. Strunk, 1990 WL 52745, at *20 (E.D. Pa. Apr. 23, 1990); however, the same court later reversed course and decided at the summary judgment stage that a negligence *per se* claim based upon a violation of the SWMA is not cognizable. Fallowfield Dev. Corp. v. Strunk, 1991 WL 17793, at *10 (E.D. Pa. Feb.11, 1991).